UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JESSEMAR TAYLOR,

                                        Petitioner,

                    v.

MICHAEL CAPRA, Superintendent of Sing Sing
Correctional Facility; THE ATTORNEY
GENERAL OF THE STATE OF NEW YORK,

                                        Respondents.

**MEMORANDUM AND ORDER**

18-CV-06406 (LDH)

LASHANN DEARCY HALL, United States District Judge:

Jessemar Taylor petitions pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus

arising out of a judgment of conviction entered in New York Supreme Court, Kings County, on a

charge of second-degree murder. (Pet., ECF No. 1.)

## BACKGROUND

### I.     The Killing of Tyquan Joyner

At approximately 5:00 p.m. on July 26, 2010, Tyquan Joyner approached Petitioner

outside Corona Pizza, near Clarkson and Rogers Avenues in Brooklyn, and was "staring

[Petitioner] down." (Aff. Opp. Pet. Writ Habeas Corpus Ex. A vol. III ("Trial Tr.") at 446:21–

447:18, ECF No. 13-3.)[1]  Petitioner testified that Joyner "reached for his waist" while

approaching him, though Petitioner did not observe a gun. (*Id.* at 475:12–21.)  Joyner asked

Petitioner "what's good." (*Id.* at 447:18–25.)  Petitioner, who was "afraid of [Joyner's]

presence," was "shocked" that Joyner was addressing him in a friendly manner. (*Id.* at 454:2–4,

479:6–17.)  Petitioner did not initially respond, which he indicated could have been perceived to

---

[1] Transcripts of the state-court proceedings comprise three volumes of Exhibit A to Respondent's opposition brief, ECF No. 13.  Volume I includes the February 14, 2012 pre-trial hearing and the April 24, 2012 pre-trial proceedings.  (ECF No. 13-1.)  Volumes II and III comprise the trial transcript.  (ECF Nos. 13-2, 13-3.)  Hereinafter, the Court cites the respective transcripts as "Pre-Trial Hr'g Tr.," "Pre-Trial Proceedings Tr.," and "Trial Tr."

mean that he did have a problem with Joyner. (*Id.* at 448:20–22, 453:21–24.) Again, Joyner asked "are you good," and this time Petitioner responded, "I ain't got no problems, I'm good." (*Id.* at 453:14–16.) Joyner then "turn[ed] his back" to Petitioner and walked north up Rogers Avenue, toward Parkside Avenue. (*Id.* at 448:4–7, 482:21–483:12.)

Petitioner walked "a minute or two" to his house, which was located near the corner of Parkside and Bedford Avenues. (*Id.* at 484:24–485:14.) He retrieved a sweatshirt and a hat from his apartment, retrieved a pistol from the stairwell between the second and third floors of his building, and returned to the area. (*Id.* at 448:7–8, 454:9–23, 489:25–490:3.) Petitioner "knew everybody would be on Clarkson Avenue, so [he] stood on [the] Parkside corner" of Rogers Avenue, one block away. (*Id.* at 455:1–2.) Petitioner saw Joyner walk out of the building at 635 Rogers Avenue, a known "gambling spot" on another corner of the same intersection. (*Id.* at 455:19–456:2.)

At trial, recollections differed as to what happened next. Petitioner testified that he crossed the street, approached Joyner, and said, "I don't want no problems with you, we could resolve this right here, like we ain't got to do no problem, like we don't need no beef, like, you shooting at me, like we don't need no beef." (*Id.* at 456:20–457:16.) Petitioner testified that Joyner turned back toward the building, which Petitioner perceived as an effort to reach for a gun. (*Id.* at 457:15–18, 459:7–460:1.) Petitioner testified that he then hit Joyner in the shoulder with the pistol, which "went off." (*Id.* at 458:11–14.) By contrast, an eyewitness testified that Petitioner pulled up the hood of his sweatshirt while walking across the street, approached Joyner as he had his key in the lock of the door, and shot him in the back of the head. (*Id.* at 343:13–344:8, 346:10–24.)

It was undisputed that Petitioner then removed his sweatshirt and hat, wrapped the pistol in the clothes, and fled the scene. (*Id.* at 458:11–459:2, 517:14–518:4.) No weapons were recovered from Joyner's person. (*Id.* at 146:23–147:2.) Joyner died as a result of "a gunshot wound track that passed from the entrance in the back of the head through the brain and through the skull, exiting the left forehead." (Trial Tr. 53:6–9, 54:8–15, ECF No. 13-2.) Forensic evidence indicated that the "the barrel of the gun . . . [was] pressed firmly against the back of the hat [Joyner was wearing] at the time that the weapon [was] discharged." (*Id.* at 57:6–58:11.) Joyner's body also had "a brush abrasion or a scrape abrasion on his left forehead and on his left knee" that were consistent with a fall to the pavement. (*Id.* at 51:23–52:10.) There were no injuries to Joyner's neck or upper back. (*Id.* at 52:11–16.)

## II.      The Police Investigation

Police collected evidence, including witness statements, on the day of the shooting. A second firearm was recovered from a nearby vehicle, a BMW. (*Id.* at 7:6–9.) This second firearm was not the weapon used to shoot Joyner and did not contain Joyner's DNA. (*Id.* at 5:9–16.) Detective Peter Margraf interviewed an eyewitness, Robinson Charlot, who stated that, after the shooter fled, he observed a man exit 635 Rogers Avenue holding his waistband, walk around Joyner's body, enter a white BMW, and place an unknown object from his waistband into the back passenger seat. (Pet. Ex. I, ECF No. 1-2.) Charlot identified the man as Andrew Daniel and described him as a "bad guy" who had fired shots at a nearby barbershop two years earlier. (*Id.*; Trial Tr. 309:9–21, 324:9–16.) Detective Margraf interviewed Daniel on the evening of the shooting, as well. (*See* Pre-Trial Hr'g Tr. 5:4–18, ECF No. 13-1 (identifying Daniel as "witness one").) Daniel informed Margraf that Joyner had been inside Daniel's apartment "just prior to being shot"; that, in the apartment, Joyner told Daniel that Joyner had exchanged words with

Petitioner, with whom Joyner was having "an ongoing dispute"; and that Daniel had witnessed Petitioner walking away from the scene after the shooting. (*Id.* at 5:19–22, 8:12–25 (identifying Petitioner as "Baby Boy").)

Two days after the shooting, Petitioner was arrested, waived his *Miranda* rights, and dictated a statement confessing to having killed Joyner. (Trial Tr. 259:8–264:7, 270:20–23, 275:13–276:14; Pet. Ex. M, ECF No. 1-4 (Petitioner's dictated statement).) Petitioner's statement included a detailed account of his lengthy history with Joyner, which included past and recent acts of intimidation, described below. (Pet. Ex. M at 1–3.) Petitioner stated that he had only intended to strike Joyner in the head with his gun, and that the gun had discharged accidentally. (*Id.* at 4.) Petitioner was indicted on one count of murder in the second degree under N.Y. Penal Law § 125.25(1) and two counts of criminal possession of a weapon under N.Y. Penal Law §§ 265.03(1)(b) and 265.03(3). (Pet Ex. H, Indictment, ECF No. 1-2.)

## III. The Pre-Trial Proceedings and Trial

Before trial, the People moved *in limine* to preclude any mention of the second firearm or the BMW whatsoever, arguing that it was non-material evidence that would confuse and distract the jury. (Trial Tr. 3:21–7:2.) In opposition, Petitioner contended that the second firearm had been in Joyner's possession and was subsequently removed from his body, and Petitioner argued that such evidence was "very integral to any defense of self-defense in this case." (*Id.* at 7:16–18, 9:15–18.) The trial court stated that the motion was granted, though its ruling appears to have granted the motion only in part:

> After listening to both parties, it's the Court's considered opinion that the motion is granted. There will be no statement regarding—by the defendant that he thought he had a weapon—no, not that he had a weapon. That this Daniel or whoever the person was had taken the gun from the body. Unless the evidence shows otherwise. . . . I will allow defense counsel to ask Mr. Robinson Charlot, should he take the

stand, as to whether he saw anyone approach the body of the decedent and take anything from his body. That's it.

(*Id.* at 19:10–16, 20:23–21:2.)

At trial, the People called Charlot as a witness. (*Id.* at 171:13.) During cross-examination, the People objected to defense counsel's line of questioning regarding "any civilians" who may have approached Joyner's body after the shooting. (*Id.* at 204:9–19.) At sidebar, the court limited the scope of permissible questions:

> My ruling is that counsel be limited to asking this witness if he knew the individual or recognized the individual who emerged from 635 Rogers Avenue after the shooting . . . . Also, the attorney for defense may ask this witness did he approach the victim's body while the body was on the ground. Additionally, did the individual who emerged from 635 actually touch the body of the victim or took [*sic*] anything from the body of the victim. And fourth, where did the individual . . . go after coming out of 635, in what direction. And that will be the limit.

(*Id.* at 231:1–14.) Following the sidebar, Charlot testified that he had told Detective Markgraf that the man who had emerged from 635 Rogers Avenue was the perpetrator of the barbershop shooting two years prior and a "bad guy." (*Id.* at 241:16–242:1.) However, Charlot did not identify the man by name. (*See id.*) Charlot further testified that the man walked "around the body" and "didn't do anything" when he got to the body. (*Id.* at 242:14–243:1.) The court sustained objections to defense counsel's questions regarding whether Charlot was "afraid" to be testifying, "concerned about anything," or "afraid of that guy" who had emerged from the building.[2] (*Id.* at 244:23–245:4, 247:4–15.)

Petitioner testified in his own defense, including as to his prior interactions with Joyner. According to Petitioner, Joyner had fired multiple shots at Petitioner on two prior occasions, in November 2008 and March 2009. (*Id.* at 438:10–439:18, 443:19–444:7.) In addition, Petitioner

---

[2] The trial court also sustained the People's objections to defense counsel's questioning of Detective Markgraf regarding Charlot's fear of Daniel. (Trial Tr. 324:17–24.) Subsequently, Markgraf did testify that he had investigated unspecified threats made to Charlot. (*Id.* at 337:5–15.)

recalled four other occasions on which he had felt threatened by Joyner. *First*, in January 2009, Joyner approached Petitioner on the street and reached for his waistband, which Petitioner assumed to mean Joyner had a gun. (*Id.* at 441:20–442:13.) *Second*, in March 2010, Petitioner and a friend were walking down the street past Joyner and a group of his friends when Joyner told one of his friends to "watch them two dudes right there, watch them," which frightened Petitioner. (*Id.* at 444:22–445:12.) *Third*, in May 2010, Joyner approached Petitioner and a group of his friends and "star[ed] down" Petitioner while talking to one of his friends, which Petitioner took to mean that Joyner was plotting to attack him. (*Id.* at 445:17–446:13.) *Fourth*, on July 1, 2010, Joyner approached Petitioner inside a store and asked if Petitioner had a problem while "grabbing his waist," which Petitioner interpreted to mean Joyner had a gun. (*Id.* at 435:2–4, 436:22–437:1, 437:24–438:4.) After Petitioner and his friends left the store, Petitioner noticed Joyner "creeping, slowly walking behind" them. (*Id.* at 437:4–9.) In addition, Petitioner testified that he was aware that Joyner had shot and killed one man and stabbed two others. (*Id.* at 449:7–452:12.)

At the charging conference, Petitioner requested a justification defense, explaining "that the defendant does not have a duty or obligation to avoid areas where he thinks [the victim] may be." (*Id.* at 538:1–2.) The trial judge held that "[a]voiding the area is one thing," however, given that Petitioner went "to the victim with a gun," "there [was] no reasonable view of the evidence that a justification defense exist[ed]." (*Id.* at 538:4–539:4.) The judge noted that evidence of Petitioner's prior interactions with Joyner had been admitted in anticipation of a justification defense. (*Id.* at 556:21–24.) However, in light of the judge's ruling precluding a justification charge, the judge prohibited any mention in summation of Joyner's criminal record or his alleged threats and acts of violence targeting Petitioner. (*Id.* at 554:4–12, 556:24–557:2.)

During summations, the trial judge sustained the People's objections to defense counsel's repeated allusions to prior interactions between Petitioner and Joyner and any justification for Petitioner's use of force against Joyner.  (*Id.* at 577:10–17, 578:25–579:10, 579:16–22, 581:1–9.)  The judge repeatedly instructed the jury not to consider a justification defense in its deliberations.  (*Id.* at 579:23–25, 581:21–582:1.)  In addition, the judge instructed that the jury may not "take . . . into consideration regarding the act of shooting . . . what [Petitioner] thought [the victim] was going to do, reach or whatever."  (*Id.* at 582:10–14.)  The jury found Petitioner guilty of murder in the second degree, and he was sentenced to 25 years to life in prison.[3]

## IV.    The Appeal

In December 2015, Petitioner perfected his direct appeal, pleading three claims of error: *first*, that the refusal of a justification charge deprived Petitioner of a fair trial; *second*, that restrictions on defense counsel's summation, preclusion of evidence suggesting Joyner was armed, and limitation of cross-examination of witnesses deprived Petitioner of his rights to effective assistance of counsel, to present a defense, and to a fair trial; and *third*, that the imposition of the maximum sentence was excessive given Petitioner's lack of a criminal record and his history with Joyner.  (Pet. Ex. A, ECF No. 1-2.)  On July 20, 2016, Petitioner filed a supplemental brief raising three additional arguments:  *first*, that Detective Margraf's testimony as to Daniel's out-of-court statements violated Petitioner's right to confront witnesses against him; *second*, that the medical examiner Dr. Pasquale-Styles's testimony exceeded her expertise, thereby violating Petitioner's right to a fair trial; and *third*, that a defect in the jury charge

---

[3] Because the jury found Petitioner guilty of second-degree murder, the jury never considered the counts of criminal possession of a weapon.  (*See* Trial Tr. 639:13–25 ("If your verdict on count number one is not guilty, deliberate next on count number two.  If your verdict on count number one is guilty, report to the Court.").)

pertaining to interested witnesses violated Petitioner's right to a fair trial. (Pet. Ex. C, ECF No. 1-2.)

On May 3, 2017, the Appellate Division affirmed the judgment of the trial court. *People v. Taylor*, 53 N.Y.S.3d 702 (App. Div. 2017). The Appellate Division held that the justification charge was properly denied; that Petitioner's arguments regarding the trial court's exclusion of the second firearm, curtailment of cross-examination, and limitation on the scope of summations—as well as the "remaining contentions" raised in Petitioner's supplemental brief— were "unpreserved for appellate review" and, "[i]n any event," failed on the merits; and that the sentence imposed was not excessive. *Id.* at 703–04. The Court of Appeals denied leave to appeal on August 16, 2017. *People v. Taylor*, 86 N.E.3d 576 (N.Y. 2017).

The instant petition was filed on November 9, 2018. In it, Petitioner argues that the trial court improperly charged the jury, restricted the defense's summation, and excluded relevant evidence, and that the People improperly failed to disclose information regarding the relocation of one of its witnesses. (Pet. 5–7.)

## STANDARD OF REVIEW

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, a petition for a writ of habeas corpus by a person in custody pursuant to a state-court judgment may only be brought on the grounds that his custody is "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A petitioner is required to show that the state-court decision, having been adjudicated on the merits, was either "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Johnson v. Williams*, 568 U.S. 289, 292 (2013).

For the purpose of federal habeas review, "clearly established Federal law" is defined as "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state-court decision is "contrary to," or an "unreasonable application of," clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question of law, (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts, or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412–13. Factual determinations made by the state court are presumed to be correct, and the petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## DISCUSSION

### I. Justification Charge

Where, as here, a petitioner claims an error in a jury instruction, "it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). Habeas relief based on a failure to supply a justification charge is appropriate when the following three questions are answered in a petitioner's favor: (1) Was the petitioner entitled to a justification charge? (2) Was the failure to supply the justification charge a violation of due process? (3) Was the denial of the justification charge a misapplication of clearly established federal law under the deferential § 2254(d) standard? *Jackson v. Edwards*, 404 F.3d 612, 621 (2d Cir. 2005). "In determining whether a petitioner was entitled to a defense under state law, federal courts must of course defer to state-court interpretations of the state's laws, so long as those interpretations are themselves constitutional." *Davis v. Strack*, 270 F.3d 111, 123 n.4 (2d Cir. 2001).

New York Penal Law § 35.15(1)(b) provides, in relevant part, that a person "may . . . use physical force upon another person when and to the extent he . . . reasonably believes such to be necessary to defend himself . . . from what he . . . reasonably believes to be the use or imminent use of unlawful physical force by such other person," unless "[t]he actor was the initial aggressor." Section 35.15(2)(a) provides, in relevant part, that such force may not constitute "deadly physical force" unless "[t]he actor reasonably believes that such other person is using or about to use deadly physical force."[4] "Even then, deadly physical force is not justified if the person knows he or she can avoid the use of force by retreating with complete safety." *People v. Hernandez*, 774 N.E.2d 198, 201 (N.Y. 2002). A trial court properly refuses a justification charge when, viewing the record in the light most favorable to the defendant, no reasonable view of the evidence would permit the factfinder to conclude that the use of force was justified. *People v. Sparks*, 73 N.E.3d 354, 355 (N.Y. 2017).

Here, the trial court determined that Petitioner was the initial aggressor and found "no evidence in the record to show that there was an [im]minent threat of death to [Petitioner] at the time or that the victim exhibited such a threat." (Trial Tr. 539:5–11, 540:3–6.) The court also found that Petitioner had a duty to retreat because "he went to confront" Joyner and "could have walked away" when Joyner turned away from him. (*Id.* at 540:10–14.) Petitioner's claim that his "testimony in itself established the basic elements of the defense" and that the trial court "applied the wrong standard by *substituting its own judgement* for that of the jury" is just plain wrong. (Mem. Law Supp. Pet. ("Mem.") 44, ECF No. 1-1 (emphasis in original).)

---

[4] The term "deadly physical force" is statutorily defined as "physical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury." N.Y. Penal Law § 10.00(11).

The New York Court of Appeals has long affirmed trial courts' denials of justification charges under circumstances similar to those of this case. In *People v. Watts*, the Court of Appeals held that the trial court had properly refused to instruct the jury on justification where the "sole probative evidence" consisted of the defendant's statement to police that the victim "came after [him] in his room with a kitchen knife." 442 N.E.2d 1188, 1190 (N.Y. 1982). The Court of Appeals held that such evidence, standing alone, was insufficient to provide a basis for determining whether the defendant reasonably believed he was in imminent danger of being subjected to deadly physical force before shooting the victim. *Id.* Similarly, in *People v. Sparks*, the Court of Appeals affirmed the trial court's refusal to instruct the jury on justification. 73 N.E3d 354, 355 (N.Y. 2017). In that case, the victim, who had a "long history of substance abuse and criminal activity" and was inebriated inside a bodega, provoked a verbal altercation with the defendant, who punched the victim, knocking him out. *Id.* When the victim recovered and walked out of the bodega, the defendant struck him in the face with a milk crate. *Id.* Even crediting the defendant's testimony "that he actually believed the victim was lying in wait for him with a weapon," the court reasoned that no reasonable person in the defendant's position would have believed the victim to have threatened him with the imminent use of unlawful physical force. *Id.* at 356. Although the facts of this case are not identical to those of *Watts* and *Sparks*, the same outcome is warranted.

Here, the sole evidence probative of the imminent threat posed by Joyner was Petitioner's testimony that Joyner turned back toward the building when Petitioner approached him, which Petitioner perceived as an effort to reach for a gun. (Trial Tr. 457:15–18, 459:7–460:1.) Such speculation by Petitioner is even less compelling than the testimony the *Watts* court found to be insufficient—that the victim had threatened the defendant with a knife, 442 N.E.2d at 1190.

Moreover, as in *Sparks*, even crediting Petitioner's testimony as to his subjective fear, a reasonable person in Petitioner's circumstances would not have believed Joyner's purported turn toward the door to indicate an imminent threat that Joyner would use unlawful physical force against Petitioner. Importantly, Joyner had not made any clearly threatening statements to Petitioner on the day of the altercation—merely asking him "what's good" and "are you good." (Trial Tr. 453:14–16.) To the contrary, Petitioner was "shocked" that Joyner had addressed him "like [they were] friends" and worried that his initial silence could be interpreted "as if [he had] a problem with [Joyner]." (*Id.* at 479:3–23.) Moreover, Petitioner did not observe a gun in Joyner's possession at the time. (*Id.* at 475:12–16.) Finally, as in *Sparks*, although the evidence of Joyner's prior conduct may have been probative of his propensity toward violence and Petitioner's subjective fear of Joyner, such evidence did not make Petitioner's fear of imminent harm reasonable under the circumstances. In other words, Joyner's prior conduct did not create a threat that he would imminently use unlawful physical force against Petitioner. Thus, the trial court correctly held that no reasonable factfinder could conclude that Petitioner's use of force against Joyner was justified.

Petitioner's reliance on *Davis v. Strack*, 270 F.3d 111 (2d Cir. 2001), is misplaced. (Mem. 37.) *Davis* does not save his claim. There, the Second Circuit found a defendant's belief that the victim was about to use deadly force against him to be reasonable. 270 F.3d at 129. The court reasoned:

> [The defendant] knew that [the victim], a six foot tall, 435-pound felon, had robbed, raped, and beaten other people at gun point. [The victim] had robbed [the defendant] at gun point three times, forced him to strip naked twice, raped him once, once urged his co-assailant to shoot [the defendant], and at their last meeting, after raping him, promised to kill [the defendant] when he next saw him. This was that next meeting. When [the defendant] crossed to the east side of Amsterdam [Avenue] to distance himself from [the victim], [the victim], who, according to eyewitness testimony, was visibly high on drugs, had followed and was advancing

towards him. As he advanced, [the victim] was keeping his eyes on [the defendant] while conversing with the woman next to him, showing that he was preoccupied with [the defendant]. A possible accomplice of [the victim's] had moved to a position directly across the street. After passing a few feet beyond [the defendant], [the victim] said to the woman with him, "I have to take care of something . . . I have to hit this guy off." While [the defendant] did not hear these words, he saw [the victim] stop and turn back in [the defendant's] direction, reaching toward his waistband. On all this evidence, we think it was undisputably reasonable for [the defendant] to believe that within a second, [the victim's] gun would once again be pointing at him, and he would be dead.

*Id.* at 129–30. This is not that case.

Here, as the trial judge correctly noted, *Davis* is distinguishable on the facts. (Trial Tr. 551:1–552:19.) Unlike the imposing victim in *Davis*, Joyner "was five feet eight inches tall and weighed 144 pounds." (*Id.* at 49:16–17.) Importantly, none of the prior interactions between Joyner and Petitioner rose to the level of severity of the rape, robberies, and beatings in *Davis*. Unlike the defendant in *Davis*, Petitioner did not testify that Joyner always carried a gun, only that Joyner had fired at Petitioner on two separate occasions months before the altercation at issue and that he had reached for his waistband on other occasions. In addition, Joyner was not approaching Petitioner at the time of their final altercation. Instead, he was turned away from Petitioner. In short, *Davis* does not compel a finding that Petitioner's fear was reasonable.[5]

---

[5] Petitioner's argument that the trial court erred in determining that he was the initial aggressor does not compel a different outcome. (*See* Mem. 45.) To be sure, under some circumstances, evidence of a victim's prior threats against a defendant may support a finding that the victim was the initial aggressor. *People v. Petty*, 852 N.E.2d 1155, 1161 (N.Y. 2006). However, under the plain meaning of Penal Law 35.15(1)(b), a finding that a defendant's use of force was unreasonable under the circumstances—as the Court has made here—obviates any need to identify the initial aggressor. Similarly, although Petitioner correctly argues that the trial court erred in finding that Petitioner had a duty to retreat, such a determination does not save his claim, either. (*See* Mem. 49.) Specifically, a duty to retreat does "not arise until the point at which [the other person's] deadly physical force was used or imminent." *Matter of Y.K.*, 663 N.E.2d 313, 314 (N.Y. 1996). As discussed above, no reasonable factfinder could conclude that Joyner threatened Petitioner with the imminent use of unlawful physical force.

Having determined that Petitioner was not entitled to a justification defense, the Court need not reach the second and third steps of the analysis. *See DeLeon v. Lempke*, 401 F. App'x 610, 612–13 (2d Cir. 2010) (summary order).

## II. Procedurally Barred Claims

Petitioner asserts two additional claims that were also raised on direct appeal. *First*, he argues that the trial judge's restrictions on defense counsel's summation violated his rights to an effective defense, effective assistance of counsel, and a fair trial under the Sixth and Fourteenth Amendments. (Mem. 56.) *Second*, he claims that the trial judge "violated [his] rights to a fair trial and to an effective defense by precluding evidence that a gun had been placed in a vehicle parked at the scene immediately after the shooting." (*Id.* at 73.)

"As a rule, a state prisoner's habeas claims may not be entertained by a federal court when (1) a state court [has] declined to address [those] claims because the prisoner had failed to meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds." *Maples v. Thomas*, 565 U.S. 266, 280 (2012) (internal quotation marks omitted). "[W]hen a state court concludes that a claim is unpreserved for appellate review, this is 'an independent and adequate state ground that bars a federal court from granting habeas relief.'" *Thompson v. Griffin*, No. 14-CV-1641, 2019 WL 1368995, at *4 (E.D.N.Y. Mar. 25, 2019) (quoting *Butler v. Cunningham*, 313 F. App'x 400, 401 (2d Cir. 2009) (summary order)). A petitioner can overcome this bar only if he can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Here, the Appellate Division held that Petitioner's arguments regarding the trial court's restrictions on his summation and exclusion of the second firearm were "unpreserved for

appellate review." *Taylor*, 53 N.Y.S.3d at 704. Contrary to Petitioner's argument otherwise, such language effectuates a procedural bar to subsequent habeas relief, notwithstanding the Appellate Division's dicta on the merits of each claim "[i]n any event." *Id.*; *see also Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810–11 & n.4 (2d Cir. 2000) ("[W]here a state court says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved."). Accordingly, the claims are procedurally barred from habeas review, and Petitioner fails to establish the requisite cause and prejudice to overcome the bar.

## III. *Giglio* Violation

Finally, Petitioner argues—for the first time—that the People's failure to disclose documents relating to efforts to relocate Charlot to protect him from Daniel deprived Petitioner of due process in violation of *Giglio v. United States*, 405 U.S. 150 (1972). (Mem. 80–82.) Although § 2254(b)(1) prohibits a district court from granting a habeas petition unless the petitioner has fully exhausted his state remedies, § 2254(b)(2) permits a court to deny a meritless petition despite a failure to exhaust state remedies.[6] *Abuzaid v. Mattox*, 726 F.3d 311, 321 (2d Cir. 2013). For the following reasons, the claim is meritless.

In *Giglio*, the Supreme Court expanded the scope of the government's disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). The Court explained:

> When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [*Brady*'s] general rule [that suppression of material evidence justifies a new trial]. We do not,

---

[6] Petitioner incorrectly contends that his *Giglio* argument does not implicate the exhaustion requirement of § 2254 because it "is not a claimed basis for Habeas Corpus relief but, rather, a fact that supports Petitioner's claim that the trial court's restrictions on evidence regarding the second gun abrogated his Sixth and Fourteenth Amendment rights to Effective Assistance of Counsel, Right to an effective defense, and the Confrontation Clause." (Reply Mem. Law Supp. Pet. Writ Habeas Corpus 4, ECF No. 14.) To exhaust a federal claim for the purpose of habeas review, a petitioner must have informed the state courts about "both the factual and legal bases for the federal claim." *Ramirez v. Att'y Gen. of State of N.Y.*, 280 F.3d 87, 94 (2d Cir. 2001). "[I]f material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." *Daye v. Att'y Gen. of State of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982). Here, the state courts were not presented with the facts underlying the purported *Giglio* violation, so the claim is not exhausted.

however, automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. A finding of materiality of the evidence is required under *Brady*. A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury.

405 U.S. at 154 (internal quotation marks, original alterations, and citations omitted). At least one circuit court has explained that the government's failure to disclose the fact that it had provided money to relocate a "key witness" whose "credibility was at issue throughout the trial" would amount to a *Giglio* violation. *United States v. Talley*, 164 F.3d 989, 1003 (6th Cir. 1999).[7] Similarly, in *People v. Colon*, the New York Court of Appeals held that the People's failure to disclose the fact that it had assisted in the relocation of the grandparents of a "crucial" prosecution witness whose credibility was at issue—coupled with the People's failure to correct the witness's misleading testimony that the only benefit he had received for his testimony had been a favorable plea deal—constituted a *Giglio* violation warranting reversal of a conviction. 918 N.E.2d 936, 939–40 (N.Y. 2009). This is not such a case.

Two other federal cases are instructive. In *Johnston v. Love*, the government failed to disclose that it had secured the pretrial release of a cooperating witness conditioned on his provision of testimony and provided the witness with $300 to assist with living expenses. 940 F. Supp. 738, 765–66 (E.D. Pa. 1996), *aff'd* 118 F.3d 1576 (3d Cir. 1997). The district court determined that the information was "potential impeachment material" that should have been disclosed. *Id.* at 766. Nonetheless, the court held that reversal was unwarranted, because "disclosure could not, with any reasonable likelihood, have affected the judgment of the jury."

---

[7] In *United States v. Talley*, the district court denied the defendant's motion for a mistrial following the government's elicitation, on direct examination, of "testimony that the government [had] provided [the witness] with money for relocation." 164 F.3d at 1003. In affirming the decision, the Sixth Circuit reasoned that, although such disclosure was required under *Giglio*, the government had not questioned the witness in such a way as to suggest the defendant was dangerous, the district court had properly prevented the government from eliciting the exact amount of the money and had provided a limiting instruction, and the defendant had expressly placed the witness's motivation at issue in the case. *Id.*

*Id.* The court reasoned that, although the witness was "was an important witness for the [government], he was not the only witness," and the defendant had had ample opportunity to impeach him in other ways. *Id.* at 766–67. In the other case, *Breest v. Perrin*, a fellow inmate who testified that the defendant had admitted to committing the murder at issue also testified on direct examination that he had not received any "promises or inducements" from the government in connection with his testimony. 624 F.2d 1112, 1114 (1st Cir. 1980). The prosecutor failed to correct this false testimony, defense counsel sought unsuccessfully to expose the lie in an "extensive cross-examination," and the prosecutor suggested in summation that the witness had made "no deal" with the government. *Id*. at 1114–15. Several years after his conviction, however, the defendant discovered that the government had in fact assured the witness that he "would be provided with a new name, location, and haircut" to protect him from retaliation for his testimony. *Id.* at 1115. The First Circuit held that reversal was not required in light of the entirety of the trial record. *Id.* at 1116. The court reasoned that defense counsel had impeached the witness with other evidence and, more importantly, that the witness's testimony was not singularly crucial:

> As a practical matter, testimony that fits like the final piece of a puzzle into an increasingly clear pattern needs a much stronger rebuttal than one that stands almost alone as a purported representation of the whole. In this case, successful impeachment of [the witness] in order to negate the impact of his judgment on the jury would have required much more than the additional evidence of the promised identity change.

*Id.* at 1117. The same outcome is warranted here.

To be sure, the People should have disclosed their efforts to assist the relocation of Charlot for his own safety as potential impeachment material, as such assistance could have

motivated Charlot to testify favorably for the People.[8]  Nonetheless, there is not a reasonable

likelihood that the failure to disclose the assistance could have affected the jury's judgment.  As

in *Johnston* and *Breest*, Petitioner's counsel ably impeached Charlot's credibility on cross-

examination, introducing prior inconsistent statements regarding both the extent to which Charlot

had observed the shooting itself and whether he recognized the man who had emerged from 635

Rogers Avenue afterward.  (Trial Tr. 236:14–242:1.)  Notably, Petitioner's counsel declined to

cross-examine Charlot regarding other impeachment evidence of which he was aware—namely,

Charlot's recent conviction for a violation.  (*Id.* at 164:22–165:21 ("I have no intent to go into

that.").)  Nor did Petitioner's counsel inquire as to any benefits Charlot had received from the

People, despite Petitioner's awareness of Charlot's fear of reprisal.  (*E.g.*, *id.* at 219:6–220:8.)

Disclosure of the relocation assistance would have had only some additional impeaching effect,

and only regarding Charlot's general propensity for truthfulness.

 More importantly, as in *Breest*, Charlot's testimony was just one piece of a larger puzzle

of evidence at trial.  Another eyewitness testified that Petitioner had shot Joyner without

provocation in the back of the head, which was corroborated by the forensic expert's testimony.

(Trial Tr. 57:6–58:11, 343:13–344:8, 346:10–24.)  As Petitioner's *Giglio* argument implicitly

recognizes, the only issue for which Charlot's testimony was integral was Petitioner's theory of

justification, based on his speculation that Joyner was armed and that the second firearm had

been removed from his dead body.  (*See* Mem. 80–82.)  To draw a connection between the

---

[8] The documents at issue include Charlot's August 2, 2010 criminal complaint—made on the same day as Charlot's grand-jury testimony—alleging that, three days earlier, a man named Stanley told Charlot's friend that Charlot "better not come back to the block or he [would] get killed." (Pet. Ex. W, ECF No 1-4 at 78.)  The documents also include an August 23, 2010 letter from the district attorney's office requesting relocation services for Charlot as a result of the threat, which the People believed was linked to Charlot's "status as an eyewitness." (*Id.* at 70–71.) Petitioner discovered the documents at issue while conducting a "[p]ost-conviction investigation." (Mem. 30 n.9.) Although Petitioner does not provide the date of his Freedom of Information Law request, he states that he received the documents in August 2018, six years after his conviction. (Mem. 80 & n.13.)  He does not explain why he did not seek the documents earlier or inquire during trial whether Charlot had received any benefits from the People.

benefit Charlot received and the second firearm would have required the following chain of inferences: that disclosing the assistance would have led the jury to disbelieve Charlot's unambiguous testimony that the man who exited 635 Rogers Avenue "didn't do anything" to Joyner's body (Trial Tr. 243:14–24); that, despite the lack of DNA evidence connecting Joyner to the firearm (*id.* at 5:9–16), the jury would have instead believed that the man had removed the second firearm from Joyner's body; and that, despite Petitioner's testimony that he did not observe Joyner in possession of a weapon (*id.* at 475:12–21), evidence of the second firearm likely would have convinced the judge to give a justification charge and convinced the jury that Petitioner had acted reasonably under the circumstances. To even articulate the argument is to understand how utterly fanciful it is.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. Because Petitioner has not "made a substantial showing of the denial of a constitutional right," a certificate of appealability shall not issue. 28 U.S.C. § 2253(c).

SO ORDERED.

Dated: Brooklyn, New York
      October 8, 2019

/s/ LDH
LaSHANN DeARCY HALL
United States District Judge